## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| **Christopher Shaw**, <br><br> Plaintiff, <br><br> vs. <br><br> **James Thomas Gillen**, <br> *in his individual capacity*; <br> and <br> **City of Beaumont, Texas**; <br> and <br> **Jefferson County Sheriff's Office's Officers/Deputies Jane and John Does 1-10**, <br> *in their official capacity*; <br> and <br> **Corrhealth, LLC**; <br> and <br> **Corrhealth, LLC's Employees Jane and John Does 1-10**, <br> *in their official capacity,* <br><br> Defendants. | Civil Action No.: |

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff Christopher Shaw (hereinafter "Plaintiff or Mr. Shaw"), by and through the undersigned counsel, and hereby files this Complaint against James Thomas Gillen, in his individual capacity (hereinafter "Defendant Gillen"); City of Beaumont, Texas (hereinafter "City"); Jefferson County Sheriff's Office's Officers/Deputies Jane and John Does 1-10 (hereinafter "JCSO's Jane and John Does 1-10 "), in their official capacity; CorrHealth, LLC;

(hereinafter "CorrHealth") CorrHealth, LLC's Employees Jane and John Does 1-10 (hereinafter "CorrHealth's Jane and John Does 1-10 "), in their official capacity.

<u>JURISDICTION AND VENUE</u>

1.

This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343(4) over Plaintiff's claims under the U.S. Constitution, which are brought both directly under 42 U.S.C. § 1983.

2.

This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U. S. Constitution.

3.

This Court has personal jurisdiction over all Defendants because the individual defendants reside in Texas, and the City of Beaumont is a subdivision of the State of Texas.

4.

Venue is proper in this District under 28 U.S.C § 1391(b)(1)(2). All of the events giving rise to this Complaint occurred within this District.

<u>PARTIES</u>

5.

Mr. Christopher Shaw is a citizen of Beaumont, Texas.

6.

Defendant Gillen was/is a resident of the State of Texas. At all times, Gillen was acting under the color of state law in his capacity as a law enforcement officer employed by the Beaumont Police Department in Beaumont, Texas.

7.

Beaumont, Texas is a municipality under the laws of Texas. The Beaumont Police Department is a department of the City of Beaumont, Texas Government.

8.

Jefferson County Sheriff's Office's Officers/Deputies Jane and John Does 1-10 (hereinafter "JCSO's Jane and John Does 1-10") are unknown at this time.

9.

CorrHealth, LLC, is a Domestic Limited Liability Company under the laws of Texas.

10.

CorrHealth, LLC's Employees Jane and John Does 1-10 (hereinafter "CorrHealth's Jane and John Does 1-10"), are unknown at this time.

FACTUAL ALLEGATIONS

*Events that occurred on June 12, 2020*

11.

On June 12, 2020, at approximately 4:02 pm, Plaintiff Mr. Christopher Shaw (herein after, Mr. Shaw), a 44-year-old abled body Black man, was standing near the 1700 Block of Roberts at Avenue D in Beaumont, Texas. Mr. Shaw was standing in the middle of the roadway, in need of medical assistance. Mr. Shaw was placed under arrest by Defendant Gillen for the misdemeanor of public intoxication.

Though Mr. Shaw had slurred speech at the time, he was able to provide identification and explain who he was and why he needed medical assistance.

12.

At the time of the arrest, Defendant Gillen positioned Mr. Shaw's hands behind his back and placed handcuffs on him, restricting his ability to move. Mr. Shaw was placed in the rear of Defendant Gillen's patrol car and was transported to Baptist Hospital (hereinafter "Baptist") in Beaumont, Texas due to signs of impairment. Mr. Shaw was examined by medical personnel at Baptist and discharged from Baptist at 4:50 pm.

13.

Defendant Gillen subsequently transported Mr. Shaw to Jefferson County Correctional Facility (herein after, "JCCF") in Beaumont, Texas. Upon arrival, Defendant Gillen exited his patrol car and removed Mr. Shaw from the rear passenger side of his police unit.

14.

At the time of his arrival at JCCF, Mr. Shaw was able to rise, stand and walk unassisted. While Mr. Shaw's hands were handcuffed behind his back, his ability to move was limited. Mr. Shaw was then guided into the JCCF with Defendant Gillen holding on to his person. Before entering the facility, Mr. Shaw slightly turned his body. Defendant Gillen responded by attempting to slam Mr. Shaw to the concrete platform at the rear entrance of the facility. However, when Defendant Gillen attempted to slam Mr. Shaw, both Mr. Shaw and Defendant Gillen fell to the ground. At that time, Defendant Gillen pressed Mr. Shaw's body into the concrete platform before JCCF officers arrived to assist Defendant Gillen with getting Mr. Shaw off the ground and inside the facility.

15.

After getting lifted from the ground and at all times relevant, Mr. Shaw walked inside the JCCF with full functional use of all his extremities. Once inside the facility, Mr. Shaw became irritated and refused to comply with the officers' commands. JCCF officers attempted to physically restrain Mr. Shaw. While Mr. Shaw was being physically restrained by JCCF officers, Mr. Shaw raised one of his legs while Defendant Gillen was in front of him. Notably, while Mr. Shaw's leg was raised, Mr. Shaw did not make contact with Defendant Gillen or any JCCF officers. In fact, at no time did Mr. Shaw attempt to strike or assault Defendant Gillen or any JCCF officers.

16.

As a result of Mr. Shaw's noncompliance, Mr. Shaw was physically restrained against a wall by Sgt. A. Davalos, and Detention Officers, D. Kegley, and M. Munselle. At all times, Sgt. A. Davalos, Detention Officers, D. Kegley, and M. Munselle had full and complete control of Mr. Shaw. At all times, Sgt. A. Davalos, Detention Officers, D. Kegley, and M. Munselle had Mr. Shaw physically restrained, Mr. Shaw was not a danger to himself or others. Although, Mr. Shaw was using profanity towards officers and staff inside JCCF, he was not a physical threat to anyone. Notably, at all times relevant, Mr. Shaw was in handcuffs with his hands restrained behind his back.

17.

Suddenly, Defendant Gillen forcibly threw an object that he was holding in his hands across the room. Next, Defendant Gillen violently grabbed Mr. Shaw, who was handcuffed with his hands behind his back, away from Sgt. A. Davalos, Detention Officers, D. Kegley, and M. Munselle who had complete control of Mr. Shaw.  Defendant Gillen body slammed Mr. Shaw, causing Mr. Shaw to land on his head. Notably, while Defendant Gillen was body slamming Mr. Shaw, Mr. Shaw's

hands were handcuffed behind his back. As such, Mr. Shaw lacked the ability to brace for impact as his head was slammed into a concrete floor with the full body weight of Defendant Gillen landing on top of him.

18.

Immediately upon impact, Mr. Shaw loss consciousness. After Defendant Gillen stood up, Mr. Shaw laid motionless on the floor with blood pouring from his head due to a laceration on his head from the impact with the concrete floor. JCCF medical providers immediately called for an ambulance to transport Mr. Shaw to the hospital. Once EMS arrived to JCCF, the EMS personnel exercised extreme care while securing Mr. Shaw for transportation due to a possible spinal cord injury. Mr. Shaw was tightly secured on a gurney and transported back to Baptist.

19.

Upon arrival at Baptist, Mr. Shaw presented to medical staff at Baptist. After a short evaluation, Mr. Shaw was released from Baptist. Defendant Gillen transported Mr. Shaw back to JCCF in his patrol car.

20.

Upon arrival for the second time at JCCF, Mr. Shaw clearly showed signs of paralysis. Specifically, Mr. Shaw was not ambulant.  Mr. Shaw was placed in a wheelchair and with the assistance of another officer, Mr. Shaw was wheeled back into JCCF. Mr. Shaw was unable to control his lower extremities. As a result, Defendant Gillen and the assisting officer had to lift his legs up while rolling the wheelchair so that Mr. Shaw's legs would not drag the ground.

21.

After being wheeled into the check-in area of JCCF again, Mr. Shaw sat in the wheelchair, unable to move his legs. Mr. Shaw had very little movement in his arms. Mr. Shaw had a noticeable

slouch as he sat in the wheelchair. Notably, Mr. Shaw's hands and arms appeared to be in a paralytic condition at this time.

22.

JCCF staff had to physically carry Mr. Shaw to a location in the facility to dress Mr. Shaw into his JCCF inmate uniform. JCCF staff had to physical hold Mr. Shaw up so that the JCCF uniform could be fitted onto his body. Subsequently, Mr. Shaw was placed in a chair in a cell where he was unable to control his body and extremities. As a result, Mr. Shaw slid out of the chair onto the concrete floor the cell and remained there without any assistance from the JCCF staff or CorrHealth, LLC's employees.

23.

While Mr. Shaw laid on the floor in his cell, unable to move, he begged CorrHealth, LLC's employees working inside of the facility to help him, but they refused to help Mr. Shaw. In fact, JCSO's Jane and John Does 1-10 JCCF and CorrHealth, LLC's employees, saw Mr. Shaw lying on the floor, but deliberately chose not to assist Mr. Shaw or provide Mr. Shaw with much needed medical attention. Mr. Shaw asked the attending nurse in the facility for help, she replied, "I won't help you until you help yourself."

24.

During the time Mr. Shaw remained on the floor, he defecated and urinated on himself multiple times due to his inability to control his bowels and kidney function. Mr. Shaw laid in his feces and urine-soaked uniform for hours and without any assistance from JCSO's Jane and John Does 1-10 or CorrHealth, LLC's employees. For almost 24 hours after being placed into a holding cell, Mr. Shaw's multiple pleas for help were deliberately ignored by JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees.

25.

While in his cell, Mr. Shaw's breathing became labored and believed that he was going to die.  Mr. Shaw cried out to the same individual who told Mr. Shaw that she would not help Mr. Shaw, that "he was going to die and it will be on your watch." Despite, clear and convincing evidence indicating that Mr. Shaw was in dire need of advance medical care, JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees still delayed before they called EMS to transport Mr. Shaw to the hospital.

26.

When EMS arrived, they entered Mr. Shaw's holding cell.  An EMT checked Mr. Shaw's chest and neck and immediately determined that Mr. Shaw's entire body was extremely swollen. Further, the EMT informed JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees, that Mr. Shaw should have been taken to the hospital immediately given Mr. Shaw's condition. Mr. Shaw was then placed on a gurney and immediately transported via ambulance to CHRISTUS Southeast Texas - St. Elizabeth Hospital (herein after, "St. Elizabeth Hospital").

27.

Upon arrival at St. Elizabeth's Hospital, Mr. Shaw was diagnosed with several spinal fractures, resulting in paralysis from the chest down.  Mr. Shaw underwent several emergency surgeries.

28.

To date, Mr. Shaw does not have the ability to stand and is wheelchair-bound. Prior to the incident, Mr. Shaw was gainfully employed at a local hotel and would often walk to work. He is no longer able to work. Mr. Shaw is unable to enjoy quality time with his family. Mr. Shaw must have around the clock assistance from others to have his basic needs met and to survive.  Mr. Shaw

can no longer perform simple and necessary daily tasks like bathing and cleaning himself. Since the incident, Mr. Shaw is bedridden for a majority of the time unless he is traveling to a required medical appointment.

29.

Mr. Shaw sustained permanent scarring and paralysis as a result of Defendant Gillen's malicious and sadistic acts towards him. Defendant Gillen acted with the intent to cause bodily harm to Mr. Shaw when intentionally slamming Mr. Shaw headfirst into a concrete floor. As a result of Defendant Gillen's malicious and sadistic actions, Mr. Shaw also suffers from severe mental anguish and severe emotional distress. Defendant Mr. Shaw's excessive force was in a direct violation of Texas law and the Constitution of the United States.

30.

Mr. Shaw sustained permanent scarring and injuries as a result of Defendant JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees' intentional and with conscious, callous and deliberate indifference to Mr. Shaw's constitutional rights. Specifically, JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees ignored Mr. Shaw's complaints for medical attention for approximately 20 hours. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees' intentional acts significantly contributed to Mr. Shaw's injuries and indefinite paralysis.

31.

As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiff was substantially injured. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, impairments and disfigurement, great pain and emotional distress, and/or aggravation of pre-existing conditions, and ongoing special damages medically/psychologically related treatment caused by the unconstitutional and moving forces'

concerted conduct of all these Defendants. Mr. Shaw also continues to suffer ongoing emotional distress, with significant PTSD type symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares and flashbacks from his assault. Plaintiff is also entitled to punitive damages on all of his claims against the individual Defendants personally to redress their willful, malicious, wanton, reckless and fraudulent conduct.

32.

Upon information and belief, the City's longstanding policy, practice, and/or custom of using excessive force was a moving force behind and caused Mr. Shaw's injuries. The City of Beaumont has been sued a number of times for alleged excessive force claims. Upon information and belief, a number of the material allegations made in those lawsuits will be shown to be true. Further, Defendant Gillen's conduct and the City of Beaumont's treatment of Defendant Gillen following Mr. Shaw's injuries (and cover-up of their conduct) is also evidence of such a policy, practice, and/or custom of the City of Beaumont encouraging, condoning, and allowing the use of excessive force by its police officers.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983-Excessive Force in Violation of the Fourteenth Amendment Due Process**
(Against Defendant Gillen)

33.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32 of this Complaint.

42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the

constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress …..

34.

Defendant Gillen in this claim is a person for purposes of 42 U.S.C § 1983.

35.

Defendant Gillen, at all times relevant hereto, was acting under the color of state law in his capacity as an Officer of The City of Beaumont, Texas Police Department and his acts or omissions were conducted within the scope of his official duties or employment.

36.

At the time of the complained events, Mr. Shaw, as a pretrial detainee, had a clearly established constitutional right under the Fourteenth Amendment to be secure in his person from unreasonable seizure through excessive force.

37.

Mr. Shaw also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

38.

Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

39.

Defendant Gillen's actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated the Fourteenth Amendment rights of Mr. Shaw.

40.

Defendant Gillen's actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to the Mr. Shaw's federally protected rights. The force used by Defendant Gillen shocks the conscience and violated the Fourteenth Amendment rights of the Mr. Shaw.

41.

Defendant Gillen unlawfully seized Mr. Shaw by means of objectively unreasonable, excessive, and conscious shocking physical force. The force used was excessive and caused the physical injuries of Mr. Shaw.

42.

Defendant Gillen engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Mr. Shaw's federally protected constitutional rights and with conscious awareness that Defendant Gillen could cause severe bodily harm.

43.

The acts or omissions of Defendant Gillen were the moving forces behind Mr. Shaw' injuries. The acts or omissions of Defendant Gillen as described herein intentionally deprived Mr. Shaw of his constitutional rights and caused him other damages. Defendant Gillen is not entitled to qualified immunity for his actions.

44.

As a proximate result of Gillen's unlawful conduct, Mr. Shaw was injured. As a further result of Gillen's unlawful conduct, Mr. Shaw incurred special damages, including medical expenses and other special damages related expenses, in amounts to be established at trial.

45.

Mr. Shaw is entitled to attorney's fees and costs pursuant to 42 U.S.C §1988, prejudgment interest and costs as allowable by federal law. There may also be special damages.

46.

In addition to compensatory, economic, consequential, and special damages, Mr. Shaw is entitled to punitive damages against each of the individually named defendants under 42 U.S.C § 1983, in that the actions of the individually named defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Shaw.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983-Denial of Medical Care in Violation of the Fourteenth Amendment Due Process**
(Against JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees)

47.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32 of this Complaint.

48.

The actions of Defendant JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees, in failing to provide timely, adequate and proper medical and hospital attention to Mr. Shaw, amounted to deliberate indifference to Mr. Shaw's injury and violated Mr. Shaw's constitutional rights.

49.

Mr. Shaw was deprived of proper medical and hospital attention for almost 20 critical hours. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had suffered blunt force trauma to the head and was rendered unconscious. JCSO's Jane

and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had to be rushed to the hospital as a result of Defendant Gillen's action.  JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had to be wheeled via wheelchair into JCCF after return from the hospital. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw lacked the ability to walk or stand upon his return to JCCF. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw lacked the ability to put on his inmate uniform.  JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw was lying on the floor in his cell with his clothing soiled and saturated in his own urine and feces. Finally, JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw was pleading for help and was lying in the same position for hours.

50.

JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees' actions clearly violated Mr. Shaw's established rights under the Constitution of the United States as follows:

(a)    the right of life, liberty and pursuit of happiness;

(b)    the right to be free from the denial of adequate medical attention under the Fourteenth Amendment;

(c)    the right to be free from cruel and unusual punishment under the Fourteenth Amendment:

(d)    the right to be free from deprivations of physical security and wellbeing under the Fourteenth Amendment;

(e)    the right to be free from summary punishment without due process of

law under Fourteenth Amendments; and

(f)      any other rights guaranteed by the United States Constitution which

may be applicable under the facts and circumstances of this case.


51.

JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were acting within

the scope of their employment at the JCCF, who was under the supervision of Jefferson County

Sheriff's Office.

## THIRD CLAIM FOR RELIEF:

### *Monell* Liability: The City's Longstanding Policy, Practice, and/or Custom of Using Excessive Force was a Moving Force Behind and Caused Mr. Shaw's Injuries
(Against The City of Beaumont, Texas)


52.

Plaintiff realleges and incorporates herein by reference each and every allegation contained

in paragraphs 1 through 32 of this Complaint.

53.

The City of Beaumont is liable for all damages referenced in these pleadings, including

those suffered by Mr. Shaw, pursuant to *Monell v. Department of Soc. Servs.,* 436 U.S. 658 (1978)

and its progeny. The City's actions and inaction otherwise referenced in this pleading, related to

alleged damages, and its policies, practices, and/or customs, were moving forces behind, resulted

in, were producing causes of, and were proximate causes of the referenced constitutional violations

and damages.

54.

Upon information and belief, the City's longstanding policy, practice, and/or custom of using excessive force was a moving force behind and caused Mr. Shaw's injuries. The City of Beaumont has been sued a number of times for alleged excessive force claims. Upon information and belief, a number of the material allegations made in those lawsuits will be shown to be true. Further, Defendant Gillen's conduct and the City of Beaumont's lack of corrective or disciplinary actions towards Defendant Gillen following Mr. Shaw's injuries and the City's concerted effort to whitewash Defendant Gillen's actions, is evidence of such a policy, practice, and/or custom of the City of Beaumont encouraging, condoning, and allowing the use of excessive force by its police officers.

55.

A.    The City's Ratification of Defendant Gillen's Conduct Reflects a Policy and/or Custom of Excessive Force

56.

Upon information and belief, the City of Beaumont failed to discipline Defendant Gillen as a result of the unconstitutional seizure and use of force. Upon information and belief, Defendant Gillen was not given any time off without pay, was not disciplined, was not reprimanded, was not instructed to act in any different manner in the future and was not instructed to participate in any additional training and/or education.

57.

The City's failure to discipline Defendant Gillen in this matter is no surprise. Rather, it is an invitation to Defendant Gillen and Beaumont Police Department officers to engage in similar and/or exact conduct. It is a statement by the City that its peace officers can use excessive force without regard to the rights of the citizens and without fear of retribution in any form, whether in

discipline or discharge. The City was also aware that its employees' accounts of the events in question were misleading or false. The City was in possession of information of eyewitness' statements and/or testimony directly at odds with the evidence presented to the grand jury and which was promoted to the media.

58

B.      The City had actual or constructive knowledge of persistent, widespread use of excessive force that has become so common and well settled as to constitute a custom that fairly represents the municipal police.

59.

The City has long known that the use of excessive force is widespread and persistent. At the time of the event in question, the City possessed evidence of similar incidents in which citizens were injured and endangered by intentional or negligent police misconduct and/or serious incompetence. The City possessed actual or constructive knowledge of such similar incidents. As previously noted in other litigation against the City of Beaumont, from March 22, 2008 through March 22, 2018, the City shows the following Citizen Complaints:

```
Citizen Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Allegation

[No data entered]:                                        1        0.89%
Department Policy:                                       11        9.82%
Department Policy / Fail to Use Video:                    1        0.89%
Fail to Take Action:                                     11        9.82%
Misconduct:                                               3        2.68%
Off-Duty Conduct:                                         2        1.79%
Officer Procedure:                                        7        6.25%
Officer Procedure (Reporting Use of Force):               1        0.89%
Profiling:                                                2        1.79%
Property Damage:                                          2        1.79%
Rude Conduct:                                             5        4.46%
Unauthorized Use of Force:                               26       23.21%
Unlawful Arrest:                                          5        4.46%
Unprofessional Conduct:                                  31       27.68%
Unreasonable Use of Force:                                4        3.57%
```

60.

The above information was received from a Freedom of Information Act (FOIA) request. As detailed, it demonstrates several categories of data applicable to the case at hand. For the time period noted, there are several noted complaint areas pertaining to use of force and off-duty conduct. Of those complaints, the following table illustrates the outcome:

```
Citizen Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Finding

[No data entered]:                                        9          8.04%
Documented:                                               2          1.79%
Exonerated:                                              44         39.29%
Not Sustained:                                           10          8.93%
Sustained:                                               21         18.75%
Unfounded:                                               20         17.86%
Withdrawn:                                                6          5.36%
```

61.

As is evident, most of the complaints go unheeded. Much like the whitewashing of excessive force pertaining to Defendant Gillen, it appears that the City's treatment of allegations of excessive force is systemic in its lack of concern or discipline pertaining to the matters. And, while the above are pertaining to Citizen Complaints, the following information is pertaining to Administrative Complaint incidents:

```
Administrative Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Allegation

Department Policy:                                      105         45.85%
Department Policy - (Untruthfulness):                    1          0.44%
Department Policy -Tardiness:                            1          0.44%
Fail to Qualify:                                         5          2.18%
Fail to Take Action:                                    12          5.24%
Firearms Discharge:                                      2          0.87%
Misconduct:                                             18          7.86%
Missing Property/Money:                                  3          1.31%
Off-Duty Conduct:                                        8          3.49%
Officer Procedure:                                      20          8.73%
Other:                                                   5          2.18%
Performance Standard:                                    7          3.06%
Police Vehicle Accident:                                 2          0.87%
Property Damage:                                         1          0.44%
Rude Conduct:                                            1          0.44%
Unauthorized Use of Force:                               2          0.87%
Unlawful Arrest:                                         1          0.44%
Unprofessional Conduct:                                 17          7.42%
Use of Force:                                           18          7.86%
```

62.

Plaintiff expects discovery to clarify the limited information received. As reflected in these complaints, the majority or substantial portion of the complaints are for use of force and officer misconduct. However, the percentage of complaints that result in any discipline or further action is limited and a small portion of the data received. This further exhibits a tolerance by the City of officer misconduct regarding the use of force which leads its officers to believe they can act with impunity, whether on- or off-duty.

63.

By allowing a policy "code of silence" to cover up officers' use of excessive force, especially Defendant Gillen, by fabricating accounts to the media and in official reports and internal affairs investigations, the City as exhibited a custom or policy of covering up constitutional violations. As part of this official policy or custom, Defendant Gillen used excessive force with the knowledge that no disciplinary action would be taken against him by the Police Department.

C.    Defendant City's failure to train its police officers constitutes deliberate indifference to the rights and welfare of the citizens of Beaumont.

64.

Defendant City's failure to train constitutes a §1983 action because the City had (1) inadequate training procedures; (2) inadequate training of Defendant Gillen caused them to use excessive force, and; (3) the City's policymakers were deliberately indifferent to Defendant Gillen's excessive use of force. The Beamont Police Department failed to provide Defendant Gillen training for:

(a)    Limiting excessive use of force.

65.

At the time of the incident, Defendant Gillen had no reason to believe that Mr. Shaw was dangerous because:

(a)    Mr. Shaw's hands were handcuffed behind his back;

(b)    Defendant Gillen was assisted by three JCCF correctional officers while bringing Mr. Shaw inside JCCF;

(c)    Mr. Shaw's body was positioned against a wall in the facility while three JCCF correctional officers had Mr. Shaw restrained and under control;

(d)    Mr. Shaw was unable to move freely, as his movement was restricted by the officers of JCCF in front of him and on each side of his body;

(e)    Though Mr. Shaw was restrained by three JCCF officers in addition to Defendant  Gillen, all parties were in the presence of more JCCF staff that were able to assist, if needed;

(f)    While Mr. Shaw was being restrained by JCCF officers, Defendant Gillen became highly agitated, tossed what he was holding and violently yanked Mr. Shaw out of the control and custody of the JCCF officers, flipped him over in the air and caused Mr. Shaw to land on his head breaking his neck and fracturing his vertebrae.

66.

Therefore, by using subjectively and objectively unreasonable force while acting under color of state law, Defendant Gillen violated Mr. Shaw rights under the Fourteenth Amendment of the United States Constitution and caused wrongful injuries.

67.

Defendant Gillen's conduct, which was objectively unreasonable, resulted from lack of training, and comported with the City of Beaumont, Texas and Beaumont Police Department's improper and/or illegal policies and practices.

68.

In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Beaumont is liable to the Plaintiff, pursuant to 42 U.S.C. § 1983, for violating Mr. Shaw's rights guaranteed by the Fourteenth Amendment.

69.

Upon information and belief, the City's customs, practices, and/or policies caused, were proximate causes or, and/or were producing causes of all damages referenced herein. The policymakers, at all times relevant to this pleading, determined the customs, practices, and policies referenced herein. The policymakers' failure to adopt, upon information and belief, policies referenced in this pleading, as well as failure to stop customs, practices, and policies which developed and which are mentioned in this pleading, were intentional choices. Thus, the City was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Mr. Shaw's constitutional rights (as well as the rights of any others who suffered Fourth Amendment and Fourteenth violations excessive use of force at the hands of Beaumont's police officers). Upon information and belief, the City's customs, practices, and/or policies were moving forces behind the violation of Mr. Shaw's right and showed deliberate indifference to the known or obvious consequences of constitutional violations. They also, upon information and belief, caused, were proximate causes or, and were producing causes of all damages resulting from unconstitutional excessive force against and seizure of Mr. Shaw.

**FOURTH CLAIM FOR RELIEF:**

**In the Alternative, Negligence**
(Against Corrhealth, LLC, Corrhealth, LLC's Employees Jane and John Does 1-10)

70.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32 of this Complaint.

71.

Additionally, and in the alternative, Corrhealth, LLC and Corrhealth, LLC's Employees Jane and John Does 1-10, failed to provide medical care, advice and treatment to Mr. Shaw during his incarceration described above that violated their duties of care owed to Mr. Shaw to exercise that degree of care, skill, supervision and diligence ordinarily possessed and used by other medical providers under the same or similar circumstances.

72.

More specifically, these Defendants were negligent in the following respects and particulars, among others:

a. Mr. Shaw was deprived proper medical and hospital attention for almost 20 critical hours;

b. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had suffered blunt force trauma to the head and was render unconscious;

c. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had to be rushed to the hospital as a result of Defendant Gillen's action;

d. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw had to be wheeled via wheelchair into JCCF after returning from the hospital. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw lacked the ability to walk or stand upon his return to the jail;

e. JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw lacked the ability to put on his inmate uniform;

f.  JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that Mr. Shaw was lying on the floor in his cell with his clothing soiled and saturated in his own urine and feces;

g.  JCSO's Jane and John Does 1-10 and CorrHealth, LLC's employees were aware that

Mr. Shaw was pleading for help and was lying in the same position for hours.

## FIFTH CLAIM FOR RELIEF:

### Gross Negligence
(Against Corrhealth, LLC, Corrhealth, LLC's Employees Jane and John Does 1-10)

73.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32 of this Complaint.

74.

The conduct of Corrhealth, by and through its agents and employees Jane and John Does 1-10.

75.

As a result, Plaintiffs sue for exemplary damages in an amount in excess of the minimum jurisdictional limits of the Court.

### SIXTH CLAIM FOR RELIEF
### Assault and Battery
(Against Defendant Gillen)

76.

Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32 of this Complaint.

77.

Defendant Gillen's actions against Mr. Shaw were unreasonable and utilized excessive force. At the time Mr. Shaw was snatched out of the custody and restraint of the other three officers by Defendant Gillen, flipped in the air and thrown onto the ground by Defendant Gillen and landing on his head fracturing his spine in several places. Mr. Shaw was unarmed; his hands were cuffed behind his back and he posed no threat to Defendant Gillen or others. Defendant Gillen acted with a disregard for the safety of the general public, constituting an intentional, unwelcomed and unprivileged touching of Mr. Shaw, which was undertaken in bad faith and with actual malice.

78.

As further direct and proximate result of the conduct described above, Mr. Shaw suffered irreparable damage to his neck, back and other injuries. Mr. Shaw suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined by an enlightened jury:

B. Economic losses on all claims allowed by law;

C. Special damages in an amount to be determined at trial;

D. Punitive damages on all claims allowed by law against all Defendants and in an amount in to be determined by an enlightened jury:

E. Attorneys' fees and the costs associated with this action under 42 U.S.C § 1988 and 1983, including expert witness fees, on all claims allowed by law;

F.  Pre-and post-judgment interest at the lawful rate; and,

G.  Any further relief that this court deems just and proper, and any other appropriate relief a law and equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 13th day of July 2022

Respectfully submitted,

_/s/Chance D. Lynch_
Chance D. Lynch
LYNCH LAW, PLLC.
227 W. Fourth St. – Suite 229
Charlotte, NC 28202
Tel. 980.800.6654
Fax. 252.565.0102
chancelynch@lynchlaw.org
NC Bar No.: 39872

(*Pro hac vice admission pending*)

_/s/Harry M. Daniels_
Harry M. Daniels
The Law Offices of Harry M. Daniels, LLC
4751 Best Road Suite 490
Atlanta, GA 30337
Tel. 678.664.8529
Fax. 800.867.5248
daniels@harrymdaniels.com
Georgia Bar No.: 234158

(*Pro hac vice admission pending*)

_/s/Demetria C. Howard_
Howard Watkins, PLLC
4303 N. Central Expy
Dallas, Texas 75205
Tel. 214.559.8811
Fax. 888.501.6345
demetria@hwatkinslaw.com
Texas Bar No.: 20487756

*/s/Chimeaka L. White*
The White Law Firm, PLLC
2207 Eastchester Drive Ste 101
High Point, NC 27265
Tel. 336.884.7246
Fax. 336.884.7247
cw@justice4pain.com
NC Bar No.: 52455

(*Pro hac vice admission pending*)