**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| CHRISTOPHER SHAW, | § |
| | § |
| Plaintiff, | § |
| | § |
| *versus* | § |
| | § |
| JAMES THOMAS GILLEN, in his | § |
| individual capacity; CITY OF BEAUMONT, | § |
| TEXAS, JEFFERSON COUNTY | § |
| SHERIFF'S OFFICE'S | § |
| OFFICERS/DEPUTIES JANE and JOHN | § |
| DOES 1-10 in their individual capacity; | §          CIVIL ACTION NO. 1:22-CV-283 |
| CORRHEALTH, LLC; GEORGIA | § |
| JACKSON, in her individual and | § |
| official capacity; JAMES SLAUGHTER, in | § |
| his individual and official capacity; | § |
| DONALD POST, in his individual and | § |
| official capacity; and BONNIE SHAVER, in | § |
| her individual and official capacity, | § |
| | § |
| Defendants.[1] | § |

## MEMORANDUM AND ORDER

Pending before the court are Defendant the City of Beaumont's ("the City") Motion for

Summary Judgment (#67), Defendant CorrHealth, LLC's ("CorrHealth") Motion for Summary

Judgment (#73), and Defendant James Thomas Gillen's ("Gillen") Motion for Summary Judgment

(#75).  Plaintiff Christopher Shaw ("Shaw") filed a Response in Opposition only to Gillen's

Motion for Summary Judgment (#80) to which Gillen filed a Reply (#81).  Having considered the

---

[1]     The style of the case has been amended to reflect the proper defendants by way of Shaw's Second
Amended Complaint filed December 29, 2023 (#45).  The individual defendants listed after CorrHealth,
LLC, are the previous Jane and John Does who are now named and sued in their individual and official
capacities.  Pursuant to the Second Amended Complaint, these four individual defendants were allegedly
employees of CorrHealth.  Shaw also now sues the Jefferson County Sheriff's Office's ("JCSO")
Officers/Deputies Jane and John Does 1-10 ("JCSO Jane and John Does") in their individual capacities,
rather than in their official capacities.

motions, the submissions of the parties, the pleadings, the record, and the applicable law, the court is of the opinion that the motions should be granted.

I.    Factual Background

By way of his Second Amended Complaint (#45), Shaw asserts claims of use of excessive force and deliberate indifference against Gillen in his individual capacity in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; a claim of deliberate indifference against JCSO Jane and John Does in their individual capacities and CorrHealth employees Georgia Jackson ("Jackson"), James Slaughter ("Slaughter"), Donald Post ("Post"), and Bonnie Shaver ("Shaver") in their individual and official capacities in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; and a claim for *Monell* liability against the City. In the alternative, Shaw alleges a claim of medical negligence and gross negligence against CorrHealth and Jackson, Slaughter, Post, and Shaver. Finally, Shaw asserts claims for assault and battery and fraudulent misrepresentation against Gillen. The operative facts are outlined in detail below.

Shaw alleges that he was detained by Gillen for the misdemeanor offense of public intoxication on June 12, 2021, in Beaumont, Texas. Shaw states that after being handcuffed behind his back, Gillen placed him in the rear of his patrol car and transported him to Baptist Hospital in Beaumont, Texas, due to signs of impairment. Shaw contends that after being examined by medical personnel at Baptist Hospital, he was discharged and then transported by Gillen to the Jefferson County Correctional Facility ("the JCCF").

Upon his arrival at the JCCF, Shaw avers that he was able to "rise, stand and walk unassisted," but his ability to move was limited due to being handcuffed behind his back. Shaw contends that before entering the facility and while Gillen was holding onto his person, he "slightly

turned his body," wherein Gillen responded by attempting to slam Shaw to the concrete platform at the rear entrance of the facility. Shaw states that as a result of this attempt, both he and Gillen fell to the ground. Shaw alleges that Gillen pressed Shaw's body into the concrete platform before JCSO officers arrived to assist Gillen in getting Shaw off the ground and into the facility.

Shaw asserts that after being lifted from the ground, he walked inside the JCCF with "full functional use of all his extremities." Shaw admits that once inside the facility, he became "irritated and refused to comply with the officers' commands" and that JCCF officers attempted to restrain him physically. Shaw further alleges that while being physically restrained against a wall, Gillen "placed his hand around [] Shaw's neck and to begin to choke him." Shaw admits that he "raised his leg" in response to being choked, but avers that he did not make contact with Gillen or any JCSO officer. Shaw claims that "at no time did [he] attempt to strike or assault" Gillen or any JCSO officer. Shaw further maintains that as a result of his admitted "noncompliance," he was physically restrained against a wall by Sergeant A. Davalos ("Davalos") and Detention Officers D. Kegley ("Kegley") and M. Munselle ("Munselle"). Shaw alleges that these individuals had "full and complete control" of him, and as a result, he did not present a danger to himself or others. Shaw also admits to directing profanity towards the officers and staff inside the JCCF, but he contends he was not a physical threat to anyone because he was handcuffed behind his back.

According to Shaw, Gillen forcibly threw an object he was holding in his hands across the room. Shaw alleges Gillen then violently grabbed him, while he was handcuffed behind his back, away from Davalos, Kegley and Munselle who, again, "had complete control" of Shaw. At this point, Shaw contends that Gillen "body slamm[ed] [him], causing [him] to land on his head and

3

neck." Shaw states that he was still handcuffed behind his back when this occurred and, thus, he lacked the ability to brace for impact. Shaw alleges that as a result, his "head was slammed into a concrete floor with the full body weight of [] Gillen landing on top of him." Shaw states he lost consciousness, lying motionless on the floor with "blood pouring from his head" due to a laceration on his head from the impact. Unidentified JCCF medical providers "immediately" called for an ambulance to transport Shaw to the hospital. Once Emergency Medical Services ("EMS") arrived, Shaw avers they used "extreme care" while securing him for transportation due to a possible spinal cord injury. Shaw was then secured to a gurney for transport to Baptist Hospital.

Once at Baptist Hospital, Shaw alleges that he was released after a short evaluation. During this time, Shaw contends he was unable to "clearly speak for himself" and "independently explain the events that transpired at the JCCF." In order to receive medical treatment, Shaw claims he relied on Gillen to speak on his behalf and to explain truthfully what happened at the JCCF in order to receive appropriate medical treatment. Shaw states that he repeatedly shouted, "Please! Please!" to the nursing staff—indicating that he was in pain and needed medical attention—yet the staff ignored him and spoke directly with Gillen. According to Shaw, an unidentified emergency room doctor specifically asked Gillen if Shaw had been tackled, to which Gillen provided an "untruthful response," stating: "He (Shaw) kind of went down and everyone went with him." Shaw concludes that Gillen made several inconsistent statements about the events which "directly impacted the medical attention needed by Shaw," including:

> [T]hat [] Shaw never lost consciousness while at JCCF, yet after [] Gillen flipped [] Shaw in the air causing him to land on his neck, [] Shaw laid unconscious for several minutes.

[T]o a Baptist Hospital nurse, "He (Shaw) kind of fell to the ground. . . 1,000 pounds were on top...none of us are small guys," and "[w]e were here for clearance earlier. He decided he did not want to go to jail and hit the floor. He never lost consciousness."

[T]o another police officer from the Beaumont Police Department, [] Gillen stated, "I took him down at the jail...top mount position. He (Shaw) kept yelling 'Don't kill me!' I had him with an underhook."

Shaw contends that Gillen was Shaw's representative to all medical providers and that he did not give true and accurate statements about the events that transpired at JCCF.

Shaw next asserts that he remained unable to move while at Baptist Hospital, lying "on a gurney for a significant amount of time."  He alleges that while he was transported to the radiology department for a CT scan of his head, he was unable to adjust his body, sit up on his own or slide his body from the gurney to the examination table without the assistance of several medical staff members.  Before leaving Baptist Hospital, Shaw avers that Gillen failed to correct any of his previous versions of "what actually happened" so that medical providers could give medical treatment "curtailed to spinal injury or impact that caused [] Shaw's paralysis."  Shaw alleges that despite continuing to express the inability to walk, feel, and move, his complaints were ignored by Baptist medical staff.[2]  He states that "all communication was had [sic] between Gillen and Baptist Hospital doctors and physicians."

Upon his discharge from Baptist Hospital, Shaw alleges medical staff told Gillen to bring Shaw back to the hospital immediately if he showed any signs of paralysis or if his physical condition worsened.  Shaw states that Gillen was provided with "Shaw's discharged [sic]

---

[2]    To date, Shaw has not added Baptist Hospital, or their employees, as defendants in this case.

instructions," which he alleges "clearly stated, 'Get help right away if you have trouble walking, have weakness in your arms and legs, or lose your balance.'"

After Baptist Hospital discharged him, Shaw states he was released into the care of Gillen, who wheeled him—with the assistance of another Beaumont Police Department ("BPD") Officer—to Gillen's patrol vehicle.  Shaw states he continued to complain about his inability to walk and move.  While being transported from the wheelchair to the back of Gillen's patrol vehicle, Shaw alleges he "somehow ended up on the parking lot pavement beside the patrol car." After stating, "I'm paralyzed!"  Shaw alleges he was told, "No you're not.  You're putting on a show."  Shaw contends that Gillen and the assisting officer were "extremely agitated and frustrated by [] Shaw's continued complaint of being paralyzed" and continued to ignore his concerns and request for further medical help.  Shaw claims that his legs dangled outside of the patrol car because he was paralyzed and unable to lift them on his own.  He states that despite "continu[ing] to share that he was paralyzed," Gillen replied, "Love for the day when people act their age," and sought no further medical attention on Shaw's behalf.

Shaw then states that Gillen realized Baptist Hospital staff had failed to remove an IV from Shaw's arm once he was inside Gillen's patrol car.  Shaw states that Gillen did not remove Shaw from the patrol vehicle, take him back inside, and have the IV removed in a "sanitized and clean area."  Rather, he states that Gillen had a nurse come outside and remove it while Shaw was still in Gillen's patrol vehicle.  Gillen then transported Shaw back to the JCCF in his patrol car.

Upon his arrival at the JCCF, Shaw states he showed clear signs of paralysis.  Shaw alleges he was not able to walk and required a wheelchair.  With the assistance of another JCSO officer, Shaw was wheeled back into the JCCF.  He states that he was unable to control his lower

extremities and officers had to lift his legs so that they would not drag on the ground while being wheeled through the facility. Once at the check-in area, Shaw alleges Gillen "directly and indirectly provided [] Shaw's discharged instruction [sic]" to CorrHealth employees Post, Shaver, Jackson, and Slaughter. While inside, Shaw claims he had "very little" movement in his arms, sat with a noticeable slouch in the wheelchair, and his hands and arms "appeared to be in a paralytic condition." Shaw maintains that he stated, "I have no legs. I can't move. I'm paralyzed," but was ignored by Gillen, Post, Shaver, Jackson, Slaughter, and the JCSO Jane and John Does. Shaw alleges that one of the JSCO John Does stated in response, "This is embarrassing!" when Shaw was slumped over in the wheelchair.

Shaw next contends that Gillen and the JCSO Jane and John Does transported him to a more private area to change his clothing "in frustration and without any respect to [] Shaw." Shaw claims that JCCF staff dragged his feet along the way and continued to use profanity towards him because he could not stand or move. Shaw states he again told all staff in the private changing area, "I can't sit up man. I can't feel nothing. I can't feel." According to Shaw, Gillen and the JCSO Jane and John Does physically carried him to a location in the facility to dress him into his JCCF inmate uniform, and while doing so, they also had to hold Shaw up so the uniform could be fitted onto his body. Shaw states he was then placed into a chair in a cell where he was unable to control his body and extremities. Shaw alleges that as a result, he slid out of the chair onto the concrete floor and remained there without assistance from the JCSO Jane and John Does or the CorrHealth employees. Shaw next contends that he begged Post, Shaver, Jackson, Slaughter, and the JCSO Jane and John Does to help him, but they refused. In addition, Shaw alleges the JCSO Jane and John Does, Post, Shaver, Jackson, and Slaughter saw Shaw lying on the concrete floor,

but deliberately chose not to assist him with "much needed advance [sic] medical attention." Shaw

states he asked either Jackson or Shaver for help and either Jackson or Shaver replied, "I won't

help you until you help yourself." Shaw goes on to allege:

> During the time [] Shaw remained on the floor, he urinated on himself multiple
> times due to his paralysis and inability to control his and [sic] kidney function. []
> Shaw laid in his urine-soaked uniform for hours and without any assistance from
> JCSO Jane and John Does 1-10 or Defendants Post, Shaver, Jackson and Slaughter.
> For almost 24 hours after being placed into a holding cell, Mr. Shaw's multiple
> pleas for help were deliberately ignored by JCSO Jane and John Does 1-10 and
> Defendants Post, Shaver, Jackson and Slaughter.
>
> While [in] custody at the [JCCF], Mr. Shaw presented with clear signs and
> symptoms of a spinal cord injury with paralysis, that a non-medical lay person
> should have been able to recognize that advance medical care was required
> immediately. Specifically, Mr. Shaw presented with the following signs and
> symptoms of a spinal cord injury with paralysis:
>
> > 1. Inability to stand or walk;
> > 2. Inability to clothed [sic] himself;
> > 3. Inability to feed himself;
> > 4. Inability to control his bladder (Neurogenic Bladder);
> > 5. Swelling and numbness; and
> > 6. Limited movement in his extremities.
>
> While in his cell [] Shaw's breathing became labored and believed that he was
> going to die. [] Shaw cried out to Defendant Jackson or [] Shaver, that 'he was
> going to die and it will be on your watch.' Despite, [sic] clear and convincing
> evidence indicating that [] Shaw was in dire need of advance[d] medical care, JCSO
> Jane and John Does 1-10 and Defendants Post, Shaver, Jackson and Slaughter still
> delayed before they called EMS to transport [] Shaw to the hospital. [] Shaw laid
> in his cell for almost 24 hrs. Notably, and at all times relevant to this matter,
> Defendant Shaver was unable to reach Dr. Elrod, the on-call physician for the
> [JCCF], in order to notify him of the situation.
>
> Eventually, Dr. Elrod was contacted by a nurse named "Christy" with CorrHealth
> . . . Upon learning of [] Shaw's medical signs and symptoms, Dr. Elrod
> immediately ordered for Mr. Shaw to be transported to St. Elizabeth's Emergency
> Room.
>
> When EMS arrived, they entered [] Shaw's holding cell. An EMT checked []
> Shaw's chest and neck and immediately determined that [] Shaw's entire body was

extremely swollen.  Further, the EMT informed JCSO Jane and John Does 1-10 and Defendants Shaver and Jackson, that [] Shaw should have been taken to the hospital immediately given [] Shaw's physical condition. [] Shaw was then placed on a gurney and immediately transported via ambulance to Christus Southeast Texas - St. Elizabeth Hospital ("St. Elizabeth Hospital").

Notably, when the EMTs were examining [] Shaw, they immediately determined that [he] presented with spinal cord injury symptoms.  Further, the EMTs questioned Defendants Shaver and Jackson on why [] Shaw laid in his cell for almost 24 hours with complaints of lower extremities paralysis.

Upon arrival at St. Elizabeth's Hospital, [] Shaw was diagnosed with several spinal fractures, resulting in paralysis from the chest down and was determined to be a [sic] [] Shaw underwent several emergency surgeries.

To date, [] Shaw does not have the ability to stand and is wheelchair-bound.  Prior to the incident, [] Shaw was gainfully employed at a local hotel and would often walk to work.  He is no longer able to work. [] Shaw is unable to enjoy quality time with his family. [] Shaw must have around the clock assistance from others to have his basic needs met and to survive. [] Shaw can no longer perform simple and necessary tasks like bathing and cleaning himself.  Since the incident, [] Shaw is bedridden for a majority of the time unless he is traveling to a required medical appointment.

For relief, Shaw seeks compensatory and consequential damages, damages for economic loss, special damages, punitive damages, attorneys' fees and costs, and pre-judgment and post-judgment interest.

II.    Procedural Background

As detailed above, Shaw's Second Amended Complaint filed December 29, 2023, is the live pleading in this matter (#45).  On January 12, 2024, CorrHealth and Gillen both filed motions to dismiss (#46 & #47).  The City filed an Amended Motion to Dismiss on January 19, 2024 (#48).  Shaw filed a Response to each on January 26, 2024 (#49 & #50), and February 2, 2024, respectively (#53).

The court held a telephone conference on July 12, 2024, with the parties informing them that the videos discussed in the motions to dismiss were not included in the court's record (#63). In their motions to dismiss, both the City and Gillen asserted that Shaw's claim for use of excessive force should be dismissed under *Heck v. Humphrey*, 512 U.S. 477 (1994), and that Shaw's factual allegations asserted in his Second Amended Complaint are directly refuted by the videos taken of the use of force incidents at issue (#64). As a result, the court ordered Gillen and the City to supplement the record with this video evidence (#63 & #64). The court further advised all Defendants that they would be allowed to reassert any arguments and defenses set forth in their motions to dismiss in a motion for summary judgment and that Shaw would have the regular time frame to respond (#63). The motions to dismiss were denied subject to reassertion in a motion for summary judgment. On the same day, the court ordered Shaw to show cause as to why his claims against Jackson, Slaughter, Post, Shaver, Davalos, Kegley, Munselle, and the JCSO Jane and John Does 1-10 should not be dismissed for failure to serve pursuant to Federal Rule of Civil Procedure 4(m) (#65). The order gave Shaw fourteen (14) days to respond. Shaw never responded to the Rule 4(m) Show Cause Order. As a result, on August 9, 2024, the court dismissed Shaw's claims against Defendants Jackson, Slaughter, Post, Shaver, Davalos, Kegley, Munselle, and the JCSO Jane and John Does 1-10 with prejudice pursuant to Federal Rule of Civil Procedure 4(m) (#72).

Currently pending are motions for summary judgment filed by the City (#67), CorrHealth (#73), and Gillen (#75). Gillen seeks unopposed leave to file excess pages (#74), and CorrHealth seeks unopposed leave to file Exhibits E, F, and H under seal (#77). As the latter two motions are unopposed, the court will grant the motions. Shaw did not file a response to the City's or CorrHealth's summary judgment motions. Shaw filed a Response only to Gillen's Motion for

Summary Judgment on September 3, 2024 (#80), to which Gillen filed a Reply (#81). In Shaw's Response, he specifically states that he abandons his state law and deliberate indifference claims against Gillen and requests oral argument regarding the remaining claims. Thus, the only claims for this court's consideration are Shaw's claim of use of excessive force against Gillen, Shaw's claim of *Monell* liability against the City, and Shaw's claims of medical negligence and gross negligence against CorrHealth. The motions for summary judgment are now ripe for review.

III.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir.), *cert. denied*, 143 S. Ct. 579 (2023); *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019). The party seeking summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which he believe[s] demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019). To warrant judgment in his favor, the movant "must establish beyond peradventure

11

*all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). At the summary judgment stage, the defendant "bears the burden of proving each element of each affirmative defense by a preponderance of the evidence." *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 697 (5th Cir. 2020) (citing *Celotex Corp.*, 477 U.S. at 322-23).

A genuine dispute of material fact exists "if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368 (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)); *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020); *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The moving party, however, "need not negate the elements of the nonmovant's case." *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *see Savoy v. Kroger Co.*, 848 F. App'x 158, 160 (5th Cir. 2021).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404,

12

410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons*, 964 F.3d at 302. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302.

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977)); *accord McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F.

Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 468 n.14)). "[S]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Lab'ys, L.L.C.*, 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"Further, although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage to the facts evidenced from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (citing *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)); *accord Valderas v. Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019). "When opposing parties tell two different stories, one of which is blatantly contradicted by [video evidence], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Valderas*, 937 F.3d at 388-89 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Nevertheless, when, despite the events in question being captured on videotape, the events at issue remain unclear, the court must view the evidence in the light most favorable to the nonmovant. *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) ("The video does not blatantly contradict [plaintiff's] version of the facts; accordingly, we view the evidence in the light most favorable to [plaintiff]."); *see Ross v. Burlington N. & Santa Fe Ry. Co.*, 528 F. App'x 960, 964 (10th Cir.

14

2013) ("When parties present conflicting evidence at the summary judgment stage, a court may rely on video footage to grant summary judgment if the recording utterly discredits the opposing party's version of the facts.").

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Lyons*, 964 F.3d at 302; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 560 (5th Cir. 2019). "[W]here the nonmoving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Goode v. Greenstream Int'l, L.L.C.*, 751 F. App'x 518, 521 (5th Cir. 2018) (quoting *Nichols v. Enterasys Networks, Inc.*, 595 F.3d 185, 188 (5th Cir. 2007)); *see Phillips v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 994 F.3d 704, 710 (5th Cir. 2021). In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008)); *accord Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023); *Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020).

IV.    <u>Analysis</u>

A.    <u>CorrHealth</u>

As previously stated, Shaw asserts claims of medical negligence and gross negligence against CorrHealth.  CorrHealth moves for summary judgment because Shaw failed to designate and provide appropriate disclosures of any medical expert pursuant to Federal Rule of Civil Procedure 26(A)(2).  CorrHealth also argues that to the extent the court construes Shaw's Second Amended Complaint to assert a § 1983 claim against CorrHealth, any such claim also fails.  In Shaw's Second Amended Complaint, Shaw asserts a claim of deliberate indifference/denial of medical care in violation of 42 U.S.C. § 1983 against Defendants JCSO's Jane and John Does 1-10 and Post, Shaver, Jackson and Slaughter (#45 at pg. 24).  There is no mention of CorrHealth.  Shaw's claims against these individual defendants were dismissed, as outlined above.  Shaw chose not to respond to CorrHealth's Motion for Summary Judgment, and this court will not liberally construe the pleadings in Shaw's favor given his representation by competent counsel.  As a result, the only claims that are appropriately before the court against CorrHealth are claims of medical negligence and gross negligence.

In Texas, "'[a] cause of action for medical malpractice is essentially a negligence action.'" *Lanier v. Sallas*, 777 F.2d 321, 323 (5th Cir. 1985) (quoting *James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982)); *see Urbach v. United States*, 869 F.2d 829, 831 (5th Cir. 1989); *Pruitt v. Box*, 984 S.W.2d 709, 711 (Tex. App.—El Paso 1998, no pet.).  As with all negligence claims, to prevail on a claim of medical malpractice, a plaintiff must prove four elements:  (1) a duty owed by the defendant to act in accordance with a certain standard of care; (2) a breach of the applicable standard of care; (3) an actual injury to the plaintiff; and (4) a causal connection between the

defendant's breach and the plaintiff's injury. *See Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021); *Urbach*, 869 F.2d at 831; *Lanier*, 777 F.2d at 323. The plaintiff is required to adduce evidence of a "reasonable medical probability" or a "reasonable probability" that the defendant's negligence was the proximate cause of his injuries. *See Matosky v. Manning*, 428 F. App'x 293, 298 (5th Cir. 2011); *Bustamante v. Ponte*, 529 S.W.3d 447, 469 (Tex. 2017); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993).

The first inquiry addressed in a medical malpractice case is whether the defendant had a duty to act according to a certain standard of care. *See Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008); *Le v. United States*, No. 4:22-CV-00147-0, 2023 WL 4708003, at *17 (N.D. Tex. July 24, 2023); *Alvarez v. Anesthesiology Assocs.*, 967 S.W.2d 871, 881 (Tex. App.—Corpus Christi 1998, no pet.). In assessing the existence of a duty in a negligence action, the court considers several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *See Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 619 (W.D. Tex. Apr. 7, 2017) (citing *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)). Of these factors, foreseeability of the risk is the dominant consideration. *Id.* Under Texas law, physicians have a duty to act as would a physician of reasonable and ordinary prudence under the same or similar circumstances. *See Hollis v. United States*, 323 F.3d 330, 336 (5th Cir. 2003); *Jackson v. Axelrad*, 221 S.W.3d 650, 655 (Tex. 2007).

17

Nevertheless, in Texas, in order to show that a physician did not conform to the required standard of care, a medical malpractice plaintiff generally must present expert testimony to meet his burden of proof. *See Hannah*, 523 F.3d at 601; *accord Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). The necessity of expert testimony has been expressly recognized in medical malpractice actions brought in Texas under the Federal Tort Claims Act. *See Hannah, 523 F.3d at 601; Quijano,* 325 F.3d at 567. "Expert testimony must establish a professional standard of care and a deviation from that standard." *Edwards* v. *United States*, 519 F.2d 1137, 1140-41 (5th Cir. 1975); *Bouche v. United States*, No. EP-06-CA-331-FM, 2007 WL 2823165, at *7 (W.D. Tex. Sept. 21, 2007).

With regard to the causation requirement, proximate cause is composed of two essential elements—cause in fact and foreseeability. *See Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 761 (5th Cir. 2019); *Rattray v. City of Brownsville*, 662 S.W.3d 860, 874 (Tex. 2023). "Cause in fact is 'but for cause,' meaning the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred." *Id.* Foreseeability means "that the defendant should have anticipated the danger that resulted from his or her negligence." *In re Signal Intern, LLC*, 579 F.3d 478, 491-92 (5th Cir. 2009); *Rattray*, 662 S.W.3d at 874. The plaintiff has the burden of proof to establish causation. *See Hannah*, 523 F.3d at 601; *Quijano*, 325 F.3d at 567. "The ultimate standard of proof on the causation issue 'is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred.'" *Montano v. Orange County*, 842 F.3d 865, 882 (5th Cir. 2016) (quoting *Park Place Hosp.*, 909 S.W.2d at 511 (quoting *Kramer*, 858 S.W.2d at 400)). Proximate cause must be shown by probative

evidence, not mere conjecture. *See Gutierrez*, 106 F.3d at 687; *Gusman v. Kroger Texas L.P.*, No. 3:19-CV-1763-B, 2021 WL 3290278, at *5 (N.D. Tex. Aug. 2, 2021). Furthermore, in order to raise a fact issue sufficient to defeat summary judgment on proximate cause in a medical malpractice case, a plaintiff must present expert medical testimony. *Frazier v. United States*, 560 F. App'x 320, 323 (5th Cir. 2014); *Thompson v. United States*, No. 4:19-CV-017-P, 2020 WL 1929852, at *4 (N.D. Tex. April 21, 2020).

Shaw has the burden of proving his case, "and the discharge of that burden would require expert medical evidence." *Portillo v. United States*, 816 F. Supp. 444, 448 (W.D. Tex. Mar. 19, 1993). "After adequate opportunity for discovery, it is obvious that the requisite expert testimony is not available." *Id.* In this instance, Shaw has had ample time to produce expert medical evidence, but he has failed to do so. Therefore, summary judgment is warranted in this case, as Shaw has offered no competent evidence to raise a genuine dispute of material fact in his medical malpractice action.

Moreover, it is well established that a party cannot succeed on a gross negligence claim in the absence of a viable negligence claim. *Woodhouse v. Bird Rides, Inc.*, No. SA-20-CV-01113-XR, 2021 WL 1986427, at *7 (W.D. Tex. May 17, 2021); *Walker v. Honest Indus., Inc.*, No. CV H-20-2289, 2021 WL 394830, at *3 (S.D. Tex. Feb. 3, 2021); *Mauer v. Wal-Mart Stores, Inc.*, No. 3:16-CV-2085-BN, 2018 WL 741629, at *7 (N.D. Tex. Feb. 7, 2018); *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied) ("Although . . . gross negligence refers to a different character of conduct, one's conduct cannot be grossly negligent without being negligent."). Thus, because Shaw does not have a viable negligence claim, he cannot succeed on his claim of gross negligence against CorrHealth.

*See Porter v. Phillips*, No. H-06-CV-03331, 2007 WL 9754463, at *3 (S.D. Tex. July 12, 2007) ("[A] plaintiff who cannot support a cause of action for negligence cannot succeed on a gross negligence claim." (citing *Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 201 n.16 (Tex. App.—Houston [14th Dist.] 2005))); *see also Galvin v. Lowe's Home Ctrs., LLC*, No. 4:21-CV-341, 2021 WL 4125100, at *2 (E.D. Tex. Sept. 9, 2021) ("To recover for gross negligence in Texas, a plaintiff must satisfy the elements of an ordinary negligence or premises liability claim.").

As a result, CorrHealth's Motion for Summary Judgment (#73) as to Shaw's claims of medical negligence and gross negligence is meritorious and will be granted.

B.    <u>Gillen</u>

Gillen asserts that Shaw's claim alleging the use of excessive force is barred by *Heck*. A plaintiff may not proceed in an action for monetary damages brought under § 1983 if a favorable outcome in the suit would necessarily imply that a state conviction or sentence was invalid. *Id.*, 512 U.S. at 487; *accord McDonough v. Smith*, 588 U.S. 109, 119-20 (2019); *Skinner v. Switzer*, 562 U.S. 521, 522 (2011); *Wallace v. Kato*, 549 U.S. 384, 392 (2007); *Wilson v. Midland County*, 116 F.4th 384, 390-91 (5th Cir. 2024); *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020); *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019); *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). In *Heck*, the Supreme Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

20

512 U.S. at 486-87; *accord Wilson*, 116 F.4th at 390-91; *Aucoin*, 958 F.3d at 382; *Magee*, 912 F.3d at 822. "[T]he *Heck* doctrine emanates from the 'policy of finality that prevents the collateral attack of a criminal conviction once that matter has been litigated.'" *Connors*, 538 F.3d at 378 (quoting *Ballard v. Burton*, 444 F.3d 391, 397 (5th Cir. 2006)). Thus, civil tort actions, including those under § 1983, "are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 654 (5th Cir. 2007) (quoting *Heck*, 512 U.S. at 487); *see Ballard*, 444 F.3d at 397; *Hainze v. Richards*, 207 F.3d 795, 798 (5th Cir. 2000).

Therefore, when a plaintiff seeks damages under § 1983, the court must "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 519 U.S. at 487; *see Brown v. Sudduth*, 675 F.3d 472, 476 (5th Cir. 2012); *Clay v. Allen*, 242 F.3d 679, 682 (5th Cir. 2001); *Hainze*, 207 F.3d at 798.

If, however, "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Heck*, 512 U.S. at 487; *see Clay*, 242 F.3d at 682; *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995). "The Supreme Court imposed this requirement on § 1983 plaintiffs in order to avoid collateral attacks by plaintiffs on convictions that are 'still outstanding.'" *Hudson v. Hughes*, 98 F.3d 868, 872 (5th Cir. 1996) (citing *Heck*, 512 U.S. at 486). "[A] civil tort action, including an action under 42 U.S.C. § 1983, is 'not [an] appropriate

vehicle[] for challenging the validity of outstanding criminal judgments.'" *Hainze*, 207 F.3d at

798 (quoting *Heck*, 512 U.S. at 487).

Shaw was charged with public intoxication and assault of a public servant in violation of

Tex. Penal Code §§ 49.02 and 22.01(b)(1).  Gillen's Motion for Summary Judgment, Exhibit A,

Probable Cause Affidavit (#75-1 at 85).  Officer Gillen outlined the following facts to support the

probable cause affidavit:

> On Saturday, June 12, 2021 at 1602 hrs., I Officer J.T. Gillen of the Beaumont
> Police Department was dispatched to the 1700 block of Roberts in Beaumont,
> Jefferson County Texas in reference to a suspicious black male in a black shirt, that
> had jumped into a United States Postal Services truck.  At this time, I was wearing
> my issued Beaumont Police duty uniform, with badge and patch and driving a
> clearly marked City of Beaumont patrol unit, clearly identifying myself as a Peace
> Officer for the City of Beaumont and State of Texas.  Upon my arrival to the area
> at 1605 hrs, I observed a black male in a black muscle shirt, standing in the middle
> of the 1700 block of Roberts at Avenue [] with clothes and his wallet and contents
> including TX DL#-------- for Christopher Shaw b/m –/–/--, scattered in the
> intersection.   Shaw displayed unsteady balance as he was walking in the roadway
> and was flailing his arms about, refusing to follow basic verbal commands.  Shaw
> displayed slurred speech as he responded and displayed red glassy eyes.  Due to his
> strong signs of intoxication, I believed Shaw was intoxicated on an unknown
> substance or other dangerous drug, to the point he did not have full use of his
> mental and physical faculties and was a danger to himself and others.  Shaw did not
> have a responsible party to be released to and if left unattended, I believed Shaw
> would continue to walk in the road and be struck by a vehicle.  Shaw was placed
> in custody for Public Intoxication (PC 49.02)-MC.  Shaw was medically cleared
> for jail at Baptist Hospital and transported to the JCCF.  Upon arrival to the jail,
> Shaw was removed from my patrol unit, where he tried to escape custody by
> pulling away as I held him.  Shaw was immediately restrained, as he caused us to
> fall, where I scraped both elbows, causing them to bleed.  Once inside the booking
> area, Shaw became aggressive, pushing his body [up against] a cell wall, using
> physical force to push against myself and Correctional Officers.  Shaw then began
> using his legs and feet intentionally and knowingly began kicking me in the shins
> and kneed me in the groin, causing pain.  Shaw was eventually restrained and also
> charged with Assault of a Public Servant (PC 22.01(b)(1)-F3.[3]

---

[3]  It is unclear from the record what, if any, substance Shaw had in his system.

*Id.* Shaw pleaded guilty to both charges and received four years of deferred adjudication probation with respect to the charge for assault of a public servant.[4] Gillen's Motion for Summary Judgment, Exhibit J, Agreed Punishment Recommendation (#76-3 at 2-7); Guilty Plea Transcript (#76-3 at 12-13); Exhibit K, Shaw Deposition (#76-3 at 26-28). Assault of a public servant requires proof of misdemeanor assault and that (1) the complainant was a public servant, (2) the actor knew that the complainant was a public servant, (3) the complainant was discharging an official duty when he was assaulted, and (4) the official duty was being discharged lawfully. *Cuevas v. State*, 576 S.W.3d 398, 399 (Tex. Crim. App. 2019) (citing *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005)). To be clear, a conviction under § 22.01(b)(1) requires proof of the lawfulness of the arresting officer's conduct, which Shaw admitted as part of his plea agreement. Furthermore, a defendant is entitled to have the issue of self-defense justification submitted on a charge of assault on a public servant, if raised by the evidence. *Martinez v. McMullen*, No. Civ. A. 402CV895Y, 2003 WL 22083626, at *3 (N.D. Tex. Sept. 8, 2003) ("Because justifiable use of force in resisting an arrest is a defense that may be submitted to a charge of assault of public servant, Martinez's claim that the officers used excessive and improper force while apprehending him, if proved, necessarily will imply the invalidity of his arrest and imprisonment for assault causing bodily injury to a public servant.") (citing *Evans v. State*, 876 S.W.2d 459, 465 (Tex. App.—Texarkana 1994, no writ)); *see also Singer v. Roberts*, No. 3:99-CV-0296-G, 2000 WL 233291, at *3-4 (N.D. Tex. Feb. 29, 2000) (holding that self-defense is a defense to the crime of assault on a public servant, and, therefore, Singer's excessive force claim

---

[4]     Shaw received 90-days deferred adjudication probation for the public intoxication charge. Gillen's Motion for Summary Judgment, Exhibit L.

23

against the defendants is barred) (discussing *Hudson*, 98 F.3d at 870 and *Sappington v. Bartee*, 195 F.3d 234, 236-37 (5th Cir. 1999)).

Despite his admission of guilt to the offense of assault of a public servant, Shaw sued Gillen, claiming he violated Shaw's civil rights.   While Shaw, briefly, admits to his noncompliance, underpinning this lawsuit is Shaw's inherently inconsistent assertion of innocence with respect to the actions to which he pleaded guilty ("In response to being choked by Defendant Gillen, Mr. Shaw raised his leg.  Mr. Shaw did not make contact with Defendant Gillen or any JCSO officers.  In fact, at no time did Mr. Shaw attempt to strike or assault Defendant Gillen or any JSCO officers," "Mr. Shaw was not a danger to himself or others," "he was not a physical threat to anyone.").  Shaw now complains that Gillen's actions were unlawful and that his claim of use of excessive force is distinct from his criminal conviction and does not negate any element of that criminal offense.  At its very core, Shaw's claim arising under the Fourteenth Amendment challenges his underlying criminal conviction, implicating the bar to a suit challenging such a conviction as set forth in *Heck*.  512 U.S. at 486-87.  Admittedly, *Heck* does not uniformly operate as a *per se* bar on excessive force claims.  *Bush v. Strain*, 513 F.3d 492, 498 (5th Cir. 2008).  The appropriate inquiry is "analytical and fact-intensive" and depends on whether "the factual basis for the conviction is temporally and conceptually distinct from the excessive force claim."  *Id*. at 497-98.

"To avoid dismissal under *Heck*, a plaintiff must clear two hurdles.  First, there must be no inherent inconsistency in a plaintiff's complaint and his underlying conviction."  *Crawford v. Pitts*, 4:20-cv01119-0, 2022 WL 479959, at *7 (N.D. Tex. Feb. 16, 2022).  "A plaintiff must not allege absolute innocence throughout the law enforcement encounter because such a position would

necessarily be contradicted by a subsequent conviction for assault on the responding public

servant." *Id*. (citing *Martin v. Roy*, 20-339-JWD-EWD, 2021 WL 1080933, at \*11 (W.D. La.

Mar. 18, 2021)); *Daigre v. City of Waveland*, 549 F. App'x 283, 286-87 (5th Cir. 2013) (noting

that Plaintiff's allegations that he did not physically resist or assault officers "relate to the entire

arrest encounter, and not merely a discrete part of it.  The result is dismissal under *Heck*.")

(internal citation omitted)).  If the first hurdle is overcome, a plaintiff must then show "(1) his

detention occurred in divisible stages, and (2) the officer(s) exerted excessive force after he was

restrained and compliant." *Crawford*, 2022 WL 479959, at \*7 (citing *Martin*, 2021 WL 1080933,

at \*11; *comparing Bush*, 513 F.3d at 498 ("A claim of excessive force that is temporally and

conceptually distinct from the conviction would not be barred by *Heck*."), with *Walter v.

Horseshoe Enter.*, 483 F. App'x 884, 887 (5th Cir. 2012) ("[A]ppellants' claims are not derived

from distinct incidents.  Their convictions for resisting arrest and their claim of use of excessive

force stem from a single interaction."); and *Walker v. Munsell*, 281 F. App'x 388, 390 (5th Cir.

2008) (Appellant's claim was not that the officers used excessive force after he stopped resisting,

but that he did not resist.  "This type of excessive force claim . . . is barred by *Heck* in our

circuit.")).

The Fifth Circuit has often utilized *Heck* and its progeny to bar a claim of use of excessive

force brought under § 1983 by an individual convicted of assault and/or battery of a police officer.

*See Price v. County of Bossier*, 841 F. App'x 650, 653-54 (5th Cir. 2021) (conviction for battery

of a police officer); *Ducksworth v. Rook*, 647 F. App'x 383, 385-86 (5th Cir. 2016) (conviction

for resisting arrest and assault and battery of an officer); *Whatley v. Coffin*, 496 F. App'x 414,

417 (5th Cir. 2012) (pleaded guilty to assault of a public servant and aggravated assault of a public

servant); *DeLeon*, 488 F.3d at 652-53 (deferred adjudication probation for aggravated assault of a police officer); *Hainze*, 207 F.3d at 798-99 (conviction for aggravated assault with a deadly weapon); *Sappington*, 195 F.3d at 237 (conviction for aggravated assault of a police officer); *see Hudson*, 98 F.3d at 872-73 (conviction for battery of an officer).[5]

       1.   <u>Innocence</u>

When a § 1983 plaintiff asserts he had no fault or proclaims his innocence with respect to the entire arrest encounter, and not merely a divisible portion of the encounter, the Fifth Circuit holds that the claim is necessarily inconsistent and inseparable from a related conviction and, therefore, *Heck*-barred. *Crawford*, 2022 WL 479959, at *8 (citing *DeLeon*, 488 F.3d at 656-57). In *DeLeon*, the Fifth Circuit determined that DeLeon's claim of use of excessive force was *Heck*-barred because his complaint alleged a single violent encounter throughout which the officer allegedly used excessive force on the "innocent" plaintiff, which implicitly challenged DeLeon's aggravated assault conviction. *DeLeon*, 488 F.3d at 656-57; *see also Daigre*, 549 F. App'x at 286-87 (holding that a plaintiff claiming innocence is *Heck*-barred from pursing excessive force claim); *Aucoin*, 958 F.3d at 383 ("As we have stated before, when a plaintiff's claim 'is based solely on his assertions that he . . . did nothing wrong, and was attacked by the [] officers for no reason,' that suit 'squarely challenges the factual determination that underlies his conviction' and is necessarily at odds with the conviction.").

As outlined above, Shaw proclaims his innocence with respect to the entire arrest encounter. Shaw does not allege that he intentionally or knowingly threatened Gillen with

---

[5]    To the extent Shaw relies on *Ballard*, this court finds the facts distinguishable. 444 F.3d at 398. In *Ballard*, the question was whether a finding that Burton's use of force was objectively unreasonable necessarily called into question the validity of Ballard's conviction for simple assault upon Boling, a different officer.

imminent bodily injury to protect himself against his unlawful use of force, that Gillen's use of excessive force occurred after he had ceased his threatening behavior, or that Gillen used force far greater than that required for his arrest and out of proportion to his threatening behavior. *See Whatley*, 496 F. App'x at 417. Instead, as set forth in the Second Amended Complaint, the incident is presented as a single violent encounter during which Gillen used excessive force and Shaw was wholly innocent.

Based on the Shaw's factual allegations alone, his use of excessive force claim is not separable from the facts resulting in his conviction for assault of a public servant because they challenge the validity of that conviction. *Daigre*, 549 F. App'x at 286 (affirming the district court's dismissal of excessive-force claim under *Heck* solely on the basis of the allegations on motion for summary judgment). By pleading guilty to assault of a public servant, Shaw admitted to the lawfulness of Gillen's conduct. In addition, Shaw was entitled to the self-defense justification in response to Gillen's alleged unlawful use of force but chose not to argue that in his state criminal trial and instead pleaded guilty. Response to Gillen MSJ, Exhibit D (#80-2 at 186-90). Shaw proclaims his innocence with respect to his conviction for assault of a public servant in an effort to sue the officer he assaulted. Because Shaw's use of excessive force claim is necessarily inconsistent with and inseparable from his conviction for assault of a public servant, his claim for the use of excessive force is *Heck*-barred and should be dismissed. *See Crawford*, 2022 WL 479959, at *8 (citing *DeLeon*, 488 F.3d at 656-67 ("DeLeon still thinks he's innocent."); *Daigre*, 549 F. App'x at 286-87 ("The total effect of these statements is clear: Daigre's excessive-force claim is barred because she 'still thinks [she is] innocent.'"); *Martin*, 2021 WL 1080933, at *11 ("[T]he Petition presents the excessive force claim as one single violent

encounter to which Plaintiff was wholly innocent."); *Dotson v. Ricks*, 4:16-cv-674-Y, 2018 WL 3046250, at *5-6 (N.D. Tex. June 20, 2018) (finding plaintiff's excessive force claim to be *Heck*-barred where plaintiff maintained he acted without fault during the police encounter)).

## 2.    Distinct Encounters

Alternatively, Shaw has not created a genuine dispute of material fact regarding his assertion in response to the motion for summary judgment that (1) his detention occurred in divisible stages or (2) that there was a use of excessive force after he was restrained and compliant. Shaw argues that the factual basis for his conviction for assault of a public servant is temporally and conceptually distinct from the use of force in question. Shaw states:

> Notably, Plaintiff entered a plea of guilty to an Assault on a Public Servant, an alleged act that happened after being choked by Defendant Gillen and before Defendant Gillen forcibly grabbed the Plaintiff from the control and custody of three detention officers who had securely detained the Plaintiff, body slamming the Plaintiff on his head and neck that resulted in the Plaintiff's permanent quadriplegia. The use of excessive force occurred in two specific instances. The use of unlawful force occurred when Defendant Gillen choked Plaintiff against the wall after Plaintiff's hands were cuffed behind his back and positioned against the wall, while being detained by Sgt. A. Davalos, Detention Officers, D. Kegley, and M. Munselle. Secondly, the use of excessive force occurred after the assault against Defendant Gillen was over.[6]

---

[6]    Although outlined in his Second Amended Complaint, Shaw makes no mention of the incident under the sally port in response to Gillen's motion for summary judgment relating to the *Heck*-bar or merits analysis. To the extent Shaw intended to assert any claim for the use of excessive force relating to Gillen's actions in the sally port, those claims are abandoned. *See Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160, at *2-3 (N.D. Tex. July 2, 2019) (determining that the plaintiff abandoned his claim by failing to respond to the defendant's Supplement to the Motion for Summary Judgment) (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)); *see also Scales v. Slater*, 181 F.3d 703, 708 n.5 (5th Cir. 1999) (plaintiff abandoned claim by failing to contest defendant's arguments for dismissal of that claim); *Gray v. Wal-Mart Stores, Tex., LLC*, No. 3:19-CV-1255-K-BT, 2020 WL 7327994, at *4 (N.D. Tex. Nov. 6, 2020) ("Because Plaintiff has offered no evidence raising a material fact issue as to any element of her . . . claim – indeed, she has not responded or offered any evidence [at] all – the Court finds that Plaintiff has abandoned her claim. . . ."), *adopted*, 2020 WL 7322737 (N.D. Tex. Dec. 11, 2020).

The video evidence in this case, however, affirmatively shows one single encounter that lasted approximately fifty seconds in which Shaw never stopped resisting once he was taken inside JCCF. Gillen MSJ, Exhibit D, Gillen Body Cam (2:30-3:16); Exhibit F, BPD Upper Angle Shot (1:30-2:16); Exhibit G, BPD Distance Angle (:30-1:16).[7] To be clear, while Shaw asserts that he was "detained" or "securely detained" by the other officers, the body cam video shows otherwise:

1.  Shaw is cursing and yelling at Gillen and the JCCF officers as they escort him into the JCCF while handcuffed behind his back (Exhibit D, 2:30 - 2:35);[8]

2.  Once inside the JCCF, Shaw continues to curse and pull away from Gillen and one JCCF officer. Gillen gives verbal commands to Shaw to "quit" two times while Shaw continues to yell profanities and pull away from them. This prompted another JCCF Officer to assist in restraining Shaw. Shaw looks at Gillen and says "that's fu---- up" to which Gillen responds

---

[7]    In Response to Gillen's Motion for Summary Judgment, Shaw uses Gillen's Body Cam (Exhibit A), Upper Angle Camera (Exhibit B), and Distance Angle Camera (Exhibit C) which are the same videos as Gillen's Exhibit D, F, and G. Exhibit I to Gillen's Motion for Summary Judgment appears to be a duplicate of Exhibit F. There is no audio with the upper angle shot or distance angle video.

[8]    Although not relevant to the *Heck* analysis, to further demonstrate Shaw's non-compliance, the video evidence shows Shaw almost immediately resisting Gillen upon his arrival at the JCCF under the sally port. Gillen can be seen removing Shaw, while handcuffed behind his back, from his patrol vehicle where Shaw stares at Gillen, saying "hey, man," and begins to attempt to move away from Gillen. Gillen tells Shaw to "quit" and Shaw continues to say "c'mon man," "man," and Gillen again tells Shaw to "quit," "we are past that." Once Gillen shuts the door to his patrol vehicle, while holding onto Shaw, Shaw continues to pull away from Gillen saying "c'mon man," "man," and while Gillen tells Shaw to "stop," Shaw pulls away from Gillen even harder, ultimately bringing them both down to the ground. Gillen holds Shaw to the ground with his left forearm while calling for assistance from the JCCF. While Shaw states "aw man, you are going to blow my brains out," Gillen continues to hold him with his left forearm while waiting for assistance, advising Shaw "to stay on the ground." Four JCCF officers are seen arriving to assist Gillen. Shaw can be seen stating, "aw, man, this is fu---- up," while trying to get up when the JCCF officers are telling him at first to stay on the ground. Gillen reminds him to "stay down." Shaw begins to yell repeatedly "for real, man," "ya'll going to kill me," "mother-fu----'s going to kill me, man," while appearing to get increasingly agitated. During this time, one JCCF officer is seen continuing to hold Shaw to the ground with both hands while Gillen holds Shaw with his left hand. Shaw is seen continuing to yell at which time Gillen tells him, "Mr. Shaw, quit," and Shaw yells back, "for real" and other indiscernible protestations. Shaw again yells, "fu---- up" to which Gillen says "hey man, quit spittin' on me." Two JCCF officers can be seen assisting Shaw off the ground where he continues to yell, "that's fu---- up, man" repeatedly while Gillen says, "c'mon man" all while Gillen and the four JCCF officers escort him into the facility. *See* Exhibit D :32-2:24.

"stop." Shaw continues to ignore the verbal commands saying, "hell no" while looking at Gillen (Exhibit D, 2:36-2:50);

3.    Shaw yells "hell no" again appearing to lunge towards Gillen who tells him again to "stop" and then uses his right arm to push Shaw back to the wall, placing his right hand under Shaw's left ear and chin. One JCCF officer is seen holding Shaw's right arm while another JCCF officer is seen pushing him back with his hands placed on Shaw's chest/abdomen area (Exhibit D, 2:51-2:54);

4.    Shaw is seen kicking towards Gillen yelling "fu--, no" while Gillen continues to give the verbal command "stop" and using his right arm to push Shaw back and the two JCCF officers continuing to push Shaw toward the wall. (Exhibit D, 2:52-2:55);

5.    The two JCCF officers change positions in response to Shaw's movements and one is seen holding Shaw with both hands at his chest level while the other holds Shaw's right arm. Shaw is continuing to yell "hell, no," repeatedly looking at Gillen who says "stop." Shaw again fails to respond to the verbal command. While Shaw is moving away from Gillen, Gillen's right hand moves from Shaw's neck area to the top of Shaw's left shoulder and clavicle. Below Gillen's hand, a fourth JCCF officer's hand is seen moving to grasp Shaw's left arm. Shaw then moves toward the JCCF officer who is directly in front of him (Exhibit D, 2:56-2:58);

6.    Shaw is subsequently seen moving toward Gillen, where it appears Gillen is reaching for Shaw, and he turns Shaw to where Shaw's back is facing Gillen. Both Shaw and Gillen are then seen falling to the ground while Shaw continues to yell, "hell no." Shaw hits his head on the ground, and Gillen tells Shaw to "stay down." Gillen gets up while one JCCF officer holds Shaw to the ground. Shaw appears stunned and is bleeding from where he hit his head. Gillen has his hand on Shaw and calls for a supervisor (Exhibit D, 2:59-3:16);

The upper angle and distance angle videos provide a broader perspective showing the ultimate need for three JCCF officers to assist Gillen in gaining control of Shaw once inside the JCCF facility, efforts that were not successful until Shaw hit his head on the ground. Gillen's Motion for Summary Judgment, Exhibit F, BPD Upper Angle Shot (1:30-2:16); Exhibit G, BPD Distance Angle (:30-1:16). In sum, the competent summary judgment evidence refutes Shaw's

assertion that his detention occurred in divisible stages or that he was ever fully restrained and compliant. Under these circumstances, the court gives greater weight to the facts as evidenced from the video recordings taken at the time of the incident in question. *Griggs,* 841 F.3d at 312 (citing *Carnaby*, 636 F.3d at 187); *see Ross*, 528 F. App'x at 964 ("When parties present conflicting evidence at the summary judgment stage, a court may rely on video footage to grant summary judgment if the recording utterly discredits the opposing party's version of the facts."). For these reasons, Shaw's conviction for assault of a public servant is temporally and conceptually inseparable from his use of excessive force claim, such that a favorable verdict on the claim for use of excessive force would undermine Shaw's criminal conviction.[9]

Accordingly, the court will grant Gillen's Motion for Summary Judgment on the grounds that Plaintiff's claim for the use of excessive force is barred under *Heck*, as Plaintiff continues to assert his innocence or, alternatively, that the competent summary judgment evidence directly refutes Plaintiff's assertion that his detention occurred in divisible stages or that he was restrained

---

[9]     The cases relied upon by Shaw can be distinguished on the facts and the video evidence in this case that directly refutes his assertions in response to the motion for summary judgment. *Cf. Bush*, 513 F.3d at 498 ("In this case, there is conflicting evidence about whether Bush was injured before or after *her resistance ceased*."); *Wells v. Cramer*, 158 F. App'x 203, 204 (11th Cir. 2005) ("To the extent that Wells's complaint alleged an excessive use of force *after he was arrested, restrained and posed no threat to the defendant officers. . .*"); *Brengettcy v. Horton*, 423 F.3d 674, 683 (7th Cir. 2005) ("After the first time when he said, mother fuc—, who told you to go downstairs, I told him I went to go mail my letter, officer, and I set the bible down on his desk. He continued talking with verbal assaults with mother fuc---- in it. *I silenced myself. I didn't say nothing. I just looked him in the eye. He struck me. I fell back.*"); *Howard v. Del Castillo*, No. 2:00-CV-3466, 2001 WL 1090797, at *4 (E.D. La. Sept. 17, 2001) ("Howard also alleges that he was beaten while he was handcuffed, *after he had been arrested and subdued* and after he had committed battery on the officer."); *Martinez v. City of Alburquerque*, 184 F.3d 1123, 1126 (10th Cir. 1999) ("The state district court properly noted that whether Martinez resisted arrest by initially fleeing the scene *is a question separate and distinct* from whether the police officers exercised excessive or unreasonable force in effectuating his arrest."); *Nelson v. Jashurek*, 109 F.3d 142, 145 (3d Cir. 1997) ("According to Nelson's complaint, he disobeyed Jashurek's orders to halt and instead ran away. Jashurek pursued and caught Nelson, and a struggle ensued. *Nelson claims that he then sat down and that when he later got up from the chair*, Jashurek beat him with a flashlight and used excessive and malicious force to subdue him.").

and compliant before the use of force in question. As a consequence, Shaw's conviction for assault of a public servant, which has not been set aside by a state or federal court, forecloses his claim of use of excessive force brought under § 1983.

      C.    <u>The City</u>

For the same reasons, Shaw's claims against the City are similarly *Heck*-barred. Vicarious liability does not apply to governmental entities for claims under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978). Rather, for § 1983 liability to attach to a municipality, a plaintiff must demonstrate three elements: "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quoting *Hicks-Fields v. Harris County*, 860 F.3d 803, 808) (5th Cir. 2017)); *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *accord Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010). However, as previously concluded, *Heck* prohibits Shaw from alleging a constitutional violation under § 1983 because allowing that claim to proceed would undermine the validity of Shaw's conviction for assault of a public servant, unless Shaw demonstrates that the conviction has been reversed or invalidated. Shaw has not done so.

As a supervisory liability claim under *Monell* requires an underlying constitutional violation, and where, as here, the underlying constitutional violation is *Heck*-barred, it cannot form the basis for a derivative *Monell* claim. *See Dodds v. City of Yorktown*, 656 F. App'x 40, 44 (5th Cir. 2016) (affirming district court's dismissal of Plaintiff's claims against the City as *Heck*-barred); *Daigre*, 549 F. App'x at 287 (same); *Whatley*, 496 F. App'x at 417 (same);

*Williams v. Town of Delhi*, No. 14-00043, 2015 WL 868746, at * 7 (W.D. La. Feb. 27, 2015) (barring claims against individual officer and municipality pursuant to *Heck*); *Deleon v. City of Corpus Christi*, No. C.A. C-05-096, 2005 WL 2045562, at * 2-3 (S.D. Tex. Aug. 24, 2005) (same).[10] Therefore, the City's Motion for Summary Judgment is granted to the extent it seeks dismissal of Shaw's *Monell* liability claim as *Heck*-barred.

V.    Conclusion

In accordance with the foregoing, it is ORDERED that Gillen's Unopposed Motion for Leave to File Excess Pages (#74) and CorrHealth's Unopposed Motion to Seal (#77) are GRANTED.

It is, further, ORDERED that the Motions for Summary Judgment filed by the City (#67), CorrHealth (#73), and Gillen (#75) are GRANTED.  Shaw's request for oral argument is DENIED.

SIGNED at Beaumont, Texas, this 13th day of March, 2025.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

[10]    DeLeon abandoned his claims against the City on appeal.  Thus, the Fifth Circuit's affirmation of the district court's opinion was as to the individual officer's claim only.